FILED
2021 Feb-11  PM 02:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CARDELL CHERRY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NUMBER: _____** |
| | ) | |
| **LIBERTY LIFE ASSURANCE** | ) | |
| **COMPANY OF BOSTON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Comes now the Plaintiff, Cardell Cherry, and hereby files his Complaint against Liberty Life Assurance Company of Boston.

## PARTIES

1.     The Plaintiff, Cardell Cherry ("Mr. Cherry"), is an insured under Long-Term Disability Policy No. GF3-850-289201-01 ("the Plan").

2.     Defendant, Liberty Life Assurance Company of Boston ("Liberty"), is the Claims Administrator for the Plan, issued to Nucor Corporation. ("Nucor"). Upon information and belief, Liberty is a foreign corporation doing business in the state of Alabama, specifically within this district.

## JURISDICTION AND VENUE

3.     This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et seq.  Plaintiff asserts claims for long-

term disability benefits, enforcement of ERISA rights and statutory violates of ERISA under 29 U.S.C. §1132. This Court has subject matter jurisdiction under ERISA without respect to the amount in controversy or the citizenship of the parties. 29 U.S.C. §1132(a),(e)(1) and (f) and 28 U.S.C. §1131. Venue is proper in this district pursuant to 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b).

## **INTRODUCTION**

4.     The traditionally held purpose of the ERISA statute is "to promote the interest of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90 (1983). Mr. Cherry, as an employee insured for disability, was supposed to be treated as a beneficiary by the Defendant as statutory fiduciary. Instead, the Defendant has victimized Mr. Cherry by engaging in utterly reprehensible claim handling procedures. The shortcomings of ERISA as it relates to claims for "welfare" benefits have been exploited by the Defendant to avoid paying Mr. Cherry's valid claim that would otherwise be payable under state insurance law. With no jury trial and no punitive damages, despite the unscrupulous conduct of the Defendant, Mr. Cherry's "relief" is limited to the amount of benefits to which he was clearly entitled in the first place, with merely the possibility of interest and attorney's fees. As described in more detail below, the Defendant has clearly engaged in bad faith claim handling and Mr. Cherry, at minimum, is patently entitled all relief that ERISA provides.

## STATEMENT OF FACTS

5.      Mr. Cherry is an insured under the Liberty Life Assurance Company of Boston, No. GF3-850-289201-01, issued to his employer, Nucor. Liberty is the administrator of the plan. The Policy provides insureds, like Mr. Cherry, long-term disability benefits.

6.      Mr. Cherry was born on May 2, 1967. He worked at Nucor Corporation as Train Conductor until his disabilities forced him to stop working on or around November 6, 2016.

7.      Mr. Cherry's medical disabilities include severe, chronic knee pain due to degenerative joint disease in his left knee, osteoarthritis in both knees, hepatomegaly with steatosis, hypertension, insomnia, sleep apnea, and PTSD. Mr. Cherry also suffers from chronic pain and discomfort in his lower extremities due to a past bunionectomy. Compounded with the multitude of side effects from his many conditions and medications, Mr. Cherry is unable to work in any capacity.

8.      Mr. Cherry was originally out of work on or around November 6, 2016 due to bunionectomy surgery in his right foot. Two months after his surgery, Mr. Cherry visited with his podiatrist, Dr. Leonard Mushkin. Dr. Mushkin noted that although Mr. Cherry believed to be improving, his recovery was "slow". Dr. Mushkin also noted that Mr. Cherry was assisted by a walker and had a "fair" but "limited" range of motion in his right foot.

9.     In an Attending Physician Statement requested by Liberty, Dr. Mushkin classified Mr. Cherry's physical impairments as severe, and did not indicate when Mr. Cherry could return to work.

10.     Alongside his chronic foot pain, Mr. Cherry also suffered from severe pain in his left knee. In a consultation with Dr. Atinuke Abijo, Mr. Cherry complained that his pain was so severe that he could not stand for more than twenty minutes. Most importantly, however, Mr. Cherry complained that his pain inhibited his job performance, which required "prolonged walking, standing and climbing." As a result of such pain, Mr. Cherry ultimately contemplated quitting his job.

11.     Due to his inability to work, Mr. Cherry applied and was approved for long-term disability benefits on February 7, 2017, and was given a disability date of November 10, 2016.

12.     Despite his recent approval, Mr. Cherry's conditions failed to improve. In March of 2017, Mr. Cherry visited with Dr. Mushkin for another pos-operative appointment. Mr. Cherry complained that he was "still sore" from the operation. Dr. Mushkin advised that Mr. Cherry continue the use of a walker and that he remain out of work for at least another eight weeks.

13.     Two months later in May of 2017, Dr. Abijo wrote to Liberty and stated that "[t]he patient has been advised not to return to work until: *indefinite*

4

based on current work activities . . .", and opined that Mr. Cherry could not engage in prolonged standing or walking of any kind, and could not engage in *any* bending or squatting. (Emphasis added).

14.    Alongside his slow recovery, Mr. Cherry was also battling a long-standing diagnosis of PTSD, stemming from his prior active duty service in the military. After being examined at his local VA clinic by a social worker, Mr. Alvin Coldtrain, it was noted that Mr. Cherry "exhibits classic PTSD symptoms" such as "intrusion", "avoidance", "hyperarousal", "insomnia," "hypervigilance", and "emotional detachment".

15.    Despite abundant evidence that Mr. Cherry's conditions failed to improve and he remained disabled, Liberty notified Mr. Cherry by letter dated April 3, 2018 that he no longer met the policy definition of disabled and therefore his claim was closed.

16.    Liberty primarily justified its wrongful denial of benefits based off of the opinions of paid reviewers, who have never even met Mr. Cherry.

17.    The reviewers audaciously opined that, despite medical evidence to the contrary, Mr. Cherry suffered from very few limitations and was furthermore able to work in a sedentary occupation.

18.    Mr. Cherry appealed his wrongful termination of benefits by letter dated April 6, 2018. Along with his appeal, Mr. Cherry included a letter from his

physician, Dr. Abijo.

19.     In her letter, Dr. Abijo opined that Mr. Cherry "is permanent[ly] and totally disabled, thus he is not about to carry out *any* duty." (emphasis added).

20.     Despite this letter and the plethora of medical evidence showing Mr. Cherry to be disabled, Liberty denied Mr. Cherry's appeal by letter dated June 15, 2018. The final denial letter, like previous letters, improperly determined that Mr. Cherry failed to meet the policy definition of disabled, and once again based its determination off of paid medical reviewers.

21.     The paid physicians audaciously opined that Mr. Cherry, a man suffering from severe, chronic knee pain, osteoarthritis, sleep disturbances, and PTSD, required very few limitations and could work in a full-time, sedentary occupation.

22.     Ultimately, Liberty improperly concluded that "the information does not contain exam findings, diagnostic test results or other forms of medical documentation supporting your symptoms or limitations rendering you unable to perform the duties of Any Occupation within your functional capacity and vocational skills . . ."

23.     Liberty's denial letters are simply an attempt to "cherry-pick" Mr. Cherry's medical records for evidence that supports the policy's termination and gives little to no weight to the plethora of evidence that supports Mr. Cherry's

disability.

24.     As of this date, Mr. Cherry has been denied benefits rightfully owed to him under the Plan. Liberty's decision to deny benefits under this long-term disability policy was grossly wrong, without basis, and contrary to the evidence.

25.     Mr. Cherry has met and continues to meet the Plan's definition of disabled.

26.     The Defendant did not establish and maintain a reasonable procedure or provide a full and fair review of Mr. Cherry's claim as required by ERISA. Instead, Defendant acted in its own pecuniary interests and violated ERISA by conducting including but not limited to the following: breaching its fiduciary duty to the Plaintiff; reviewing the claim in a manner calculated to reach the desired result of denying benefits; and failing to properly consider and credit the medical opinions of Mr. Cherry's medical providers.

27.     Upon information and belief, Liberty evaluated and paid all claims under the LTD Plan at issue, creating an inherent conflict of interest.

28.     Upon information and belief, the Plan does not grant discretionary authority to determine eligibility for benefits to Defendant or to any other entity who may have adjudicated Mr. Cherry's claim. Therefore, the Court should review the Plaintiff's claim for benefits under a *de novo* standard. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In the alternative, the denial of

Plaintiff's benefits constitutes an abuse of discretion.

29.    Mr. Cherry has exhausted any applicable administrative review procedures and Defendant's refusal to pay benefits is erroneous, unreasonable, and has caused tremendous financial hardship on Plaintiff.

## DEFENDANT'S WRONGFUL AND UNREASONABLE CONDUCT

### A. Defendant's Determination that Plaintiff does not Meet the Definition of Disability as Stated in the Plan was both Erroneous and Unreasonable.

30.    The LTD Plan at issue states, in part:

"Disability" or "Disabled" means:

i.    during the Elimination Period and the next 12 months Covered Person reaches the end of the Maximum Benefit Period, as a result of injury or sickness, he is unable to perform the Material and Substantial Duties of his Own Occupation; and

ii.    thereafter, you are unable to perform, with reasonable continuity, the Material and Substantial Duties of his Own Occupation.

31.    According to Liberty, Mr. Cherry's LTD benefits were approved and paid from February 8, 2017 until March 30, 2018 because Liberty determined that he was unable to perform the material duties of his own occupation. Liberty does not identify any particular reason for choosing the March 30, 2018 termination date and appears to have arbitrarily decided that on the following day Mr. Cherry would have the ability to return to work in a sedentary level job, contrary to the opinions of his treating physicians.

32.     On March 19, 2018, Dr. Daniel Harrop conducted an Independent Peer Review based on documents provided by Liberty. Dr. Harrop noted that the documents provided support the diagnoses of PTSD. However, Dr. Harrop seemingly undermined the potential severity of Mr. Cherry's PTSD, by stating that "PTSD is a disorder that is highly manageable".

33.     Ultimately, Dr. Harrop determined that Mr. Cherry does not have any functional psychiatric impairment. Without examining Mr. Cherry nor speaking with Mr. Cherry's physicians, Dr. Harrop concluded that there was no indication of restrictions, limitations, or side effects from medications that would preclude Mr. Cherry from full-time work.

34.     Another Independent Peer Review was conducted by Dr. Steven Winkel on May 9, 2018. Dr. Winkel who stated that the medical documentation supported a finding of degenerative disc disease in his left knee and osteoarthritis. Moreover, Dr. Winkel also acknowledged that Mr. Cherry's conditions are unlikely to improve "without additional surgical intervention." Despite these statements, Dr. Winkel somehow concluded that there was no indication of restrictions or limitations to preclude him from working full-time.

35.     The findings are contrary to the opinions of Mr. Cherry's treating physicians. Furthermore, Dr. Harrop and Dr. Winkel never personally examined Mr. Cherry. Accordingly, Defendant's contention that Mr. Cherry failed to prove

that he was disabled under the LTD Plan must be rejected.

**B. Defendant's Decision to Deny LTD Plan Benefits was not Supported by Substantial Evidence.**

36.     In its consideration of Mr. Cherry's claim, Defendant only retained paid consultants to review his file. Defendant based its denials entirely on the allegations that Mr. Cherry's medical records do not demonstrate that his disabilities make him unable to work at his own position, yet it never sought even one independent physical examination.  Further, in denying Mr. Cherry's claim, Liberty failed to give proper weight to the medical evidence provided by his treating physicians.

1.   Defendant's Reliance on Paper-Reviews to Deny Benefits on the Basis of Insufficient Evidence Was Arbitrary and Capricious.

37.     Mr. Cherry's claim file is replete with medical records from his treating physicians extensively detailing his limitations, both mental and physical. Mr. Cherry's physicians' assessments, treatment and medications they prescribed and administered, all demonstrate that Mr. Cherry's diagnosed disabilities were extremely debilitating.

38.     The records of Mr. Cherry's long-standing medical providers, who have no stake in the outcome of the case, clearly evidence that he is disabled based on their numerous personal examinations, testing, and procedures.  Liberty's hired medical reviewers, on the other hand, did not examine Mr. Cherry.  The conclusion

that Mr. Cherry was not disabled was based merely on hired reviewers' assessment of his paper medical records. *See Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801,809 (6th Cir. 2002)(finding that evidence in the administrative record did not support the revocation of benefits because the only doctors that disagreed with the treating physicians were non-examining consultants hired by the insurance company); *see also Kalish v. Liberty Mutual*, 419 F.3d 501, 508 (6th Cir. 2005)("[w]hether a doctor has physically examined the claimant is indeed one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician").

39.     In weighing the opinions of Mr. Cherry's providers against those of the independent reviewers retained by Liberty, the Court should consider the following factors: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) other relevant factors. *See Karanda v. Connecticut Gen. Life Ins. Co., et al.,* 158 F. Supp. 2d 192, 205 and n.8 (D. Conn. 2000) (citing *Durr v. Metropolitan Life Ins. Co.,* 15 F. Supp. 2d 205, 213 (D. Conn. 1998)).  The Court in *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003) recognized that "treating physicians, as a rule, have a greater opportunity than consultants to know

and observe the patient as an individual." While *Nord* provides that this Court is not required to adopt a per se rule to treat Mr. Cherry's physicians' opinions with more weight than those of Defendant's medical assessors, "[c]ommon sense and a stream of legal precedent suggest, however, factual determinations of a treating physician are objectively more reliable." *Burt v. Metropolitan Life Insurance Co.,* No. 1:04-CV-2376-BBM, 2005 U.S. Dist. LEXIS 22810, at *33 (N.D. Ga. Sept. 16, 2005);  *see also Finazzi v. Paul Revere Life Ins. Co.*, 327 F.Supp.2d 790, 795-96 (W.D. Mich. 2004) ("the Court is not obliged to 'rubber stamp' [defendant's] termination of benefits . . .").

40.    Paid experts are more often than not pre-disposed or preconditioned. Courts have consistently expressed their skepticism of such "experts" and held their reviews to be the very essence of arbitrariness and capriciousness. *Bennett v. Kemper HAT-Svcs, Inc.* 514 F. 3d 547, 554-55 (6th Cir. 2008); *Montour v. Hartford Life and Acc. Ins. Co.,* 588 F. 3d 623 (9th Cir. 2009); *Regula v. Delta Family Care Plan* 226 F.3d. 1130, 1143 (9th Cir. 2001).  The Supreme Court has acknowledged that "physicians repeatedly retained by benefits plans may have an 'incentive to make a finding of "not disabled" in order to save their employers money and preserve their own consulting agreements.'" *Nord,* 538 U.S. 822, 832, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003).  The fact that their reports are consistently in conflict with the opinion of treating doctors' determinations should be viewed as

evidence of a structurally conflicted process that results in bias.  Clearly, in Mr. Cherry's case, these decisions indicate that his own medical physicians' evaluations should be afforded far greater weight than those of Defendant, especially since Defendant's reviewers never bothered with even one of the multiple physical exams allowed by the Plan.  Accordingly, Defendant's denial of Mr. Cherry's LTD benefits, based on insufficient evidence, was arbitrary and capricious.

41.    Mr. Cherry's treating physicians, who have no financial stake in the outcome of his claim, reached the opinion that he is disabled based on their numerous examinations of him.

42.    The baseless findings of Liberty's non-examining salaried employee physician and consulting physician stand alone as the only findings in Mr. Cherry's file suggesting that he is not disabled and are overwhelmed by the numerous treatment records and the opinions of his treating physicians suggesting the opposite.

43.    Accordingly, Defendant's termination of Mr. Cherry's Plan benefits was not properly supported.

2.    <u>Defendant's Failure to Properly Credit Mr. Cherry's Well-Documented Subjective Complaints Was Arbitrary and Capricious.</u>

44.    Admittedly, some of Mr. Cherry's disabling impairments have subjective components; however, they have been diagnosed by his treating

physicians based on his medical history, extensive testing, and physical examinations. Defendant far exceeds its discretion to ascertain Mr. Cherry's credibility by characterizing the bulk of his treatment records as somehow flowing from his own subjective reports of pain, and thus equally subject to rejection as non-credible.

45.     In *Quigley v. UNUM Life Ins. Co. of America,* 340 F. Supp. 2d 215, 224 (D. Conn. 2004), the Court held "[w]here the record reveals well-documented complaints of chronic pain, and there is no evidence in the record to contradict the claimant's complaints, the claim administrator, and the court, cannot discredit the claimant's subjective complaints."

46.     An administrator may not exclude a claim for lack of objective medical evidence unless that standard was made "clear, plain and conspicuous enough [in the policy] to negate layman [plaintiff's] objectively reasonable expectations of coverage." *Saltarelli v. Bob Baker Group Medical Trust et al.,* 35 F.3d 382, 387 (9th Cir. 1994); *see also May v. Metro. Life Ins. Co.,* 2004 U.S. Dist. LEXIS 18486, *26 (N.D. Cal. Sept. 9, 2004) ("MetLife abused its discretion by requiring that Plaintiff meet an additional requirement for eligibility beyond those imposed by the Plan."); *see also Duncan v. Continental Cas. Co.,* 1997 U.S. Dist. LEXIS 1582, *15-17 (N.D. Cal. Feb. 10, 1997) (finding an insurer improperly denied the claim of the plaintiff, who had fibromyalgia, due to a lack of "objective

medical evidence" to support her disability claim).

47.     In *Creel v. Wachovia Corp.,* No. 08-10961, 2009 U.S. App. LEXIS 1733, 2009 WL 179584 (11th Cir. Jan. 27, 2009) and *Oliver v. Coca-Cola Co.,* 497 F.3d 1181, 1196-97 (11th Cir. 2007), *vacated in part on other grounds*, 506 F.3d 1316 (11th Cir. 2007), the United States Court of Appeals for the Eleventh Circuit considered when it was substantively reasonable to deny benefits for disabilities involving subjective elements. In *Creel,* the plaintiff applied for disability benefits based on a diagnosis of depression, anxiety, and migraine headaches. She received long-term disability benefits, but the benefits were terminated after twenty-four months pursuant to a mental disorder limitation. She sued the insurance company to recover additional benefits based on her migraine headaches. She provided chart notes, standard diagnoses, and lab reports to support her claim, but the district court entered summary judgment against her because she did not provide objective evidence. The Court of Appeals vacated the summary judgment order, explaining:

> Our prior cases provide guidance for assessing the reasonableness of benefits denials for disabilities that involve some subjective element, such as migraines, fibromyalgia, and chronic pain syndrome. . . . When the plan has no [objective evidence requirement,] we evaluate the reasonableness of the decision in light of the sufficiency of the claimant's subjective evidence and the administrator's actions. Assuming that the claimant has put forward ample subjective evidence, we look at what efforts the administrator made to evaluate the veracity of her claim, particularly focusing on whether the administrator identified any objective evidence that would have proved the claim and on what kinds of independent physician

evaluations it conducted. Accordingly, an administrator's decision to deny benefits would be unreasonable if it failed to identify what objective evidence the claimant could have or should have produced, even if the administrator submitted the file for peer review.

2009 U.S. App. LEXIS 1733, [WL] at *7.

48.     Applying this standard, the Court of Appeals in *Creel* found that the records offered by the plaintiff to corroborate her subjective complaints of disabling headaches were sufficient to support her claim and held that the administrator's decision was both wrong and unreasonable. 2009 U.S. App. LEXIS 1733, [WL] at *8.  Similarly, in *Oliver*, the plaintiff sued his employer to recover long-term disability benefits based upon radiculopathy and associated cervical pain, fibromyalgia, and chronic pain syndrome. The Court of Appeals held that it was arbitrary and capricious for an employer to deny benefits for disabilities involving elements of subjective pain when the claimant provided ample evidence and the administrator never requested any additional kind of evidence. *Oliver,* 497 F.3d at 1196-97.

49.     Here, Mr. Cherry provided extensive objective and subjective evidence of his disabilities.   His medical records contain well-documented complaints of pain, PTSD, sleep disturbances such as insomnia, other symptoms as a result of his medications and constant discomfort.   Although Liberty had paid medical reviewers consider his file, those reviewers never actually examined Mr. Cherry, and they failed to provide any valid independent basis for their conclusion

that he is not disabled under the Plan.  Here, Mr. Cherry has provided subjective evidence *and extensive objective evidence*, all supporting his claim of disability as defined in the Plan.  Accordingly, Defendant's decision to deny disability benefits was substantively unreasonable.

### C.   Liberty Unreasonably Failed to Properly Consider Mr. Cherry's Non-Exertional Limitations and the Cognitive Requirements.

50.   As previously stated, the Defendant presumably found that Mr. Cherry is capable of performing a full-time sedentary occupation. However, the occupation requires far more than the ability to perform the physical requirements of the job. In *Demirovic v. Bldg. Serv. 32 B-J Pension Fund,* 467 F.3d 208, 213-14 (2d Cir. 2006), the Court stated, "[A] reasonable interpretation of a claimant's entitlement to payments based on a claim of 'total disability' must consider the claimant's ability to pursue gainful employment in light of all the circumstances." Thus, an administrator must consider whether a beneficiary has "the vocational capacity to perform any type of work . . . that actually exists in the national economy." *Id.* at 213-215.

51.   The Court must consider a plaintiff's non-exertional limitations, including (1) intellectual and psychological limitations, including those related to the side effects of prescription medications and pain; (2) limited manual dexterity; and (3) a limited ability to remain seated for an extended period of time. Such non-exertional limitations can be important aspects of vocational capacity. *See Rabuck*

*v. Hartford Life and Accident Ins. Co.*, 522 F. Supp. 2d 844, 876-77 (W.D. Mich. 2007) (holding that failure to consider non-strength limitations of former company president with short-term memory limitations rendered Transferable Skills Analysis "incredible").

52.    Mr. Cherry has provided credible medical evidence that he is prescribed numerous pain medicines and has cognitive difficulties due to his PTSD and insomnia.

53.    All of Mr. Cherry's treating physicians consistently supported his disability claim in both treatment notes and medical statements provided to Liberty.  Plaintiff's secondary medical issues compound his primary problems and it was unreasonable for the Defendant to fail to properly consider the impacts of Mr. Cherry's non-exertional limitations in its decision.

**D.    Defendant Failed to Justify Taking a Position Different from the Social Security Administration on the Question of Disability.**

54.    Although Mr. Cherry was approved for SSDI benefits after he exhausted his administrative remedies, Liberty failed to consider its decision and failed to discuss any substantive reasons for reaching a decision contrary to that of the SSA.

55.    In stark contrast to Liberty's findings that Mr. Cherry had no medical impairment that would limit his ability to perform a full-time sedentary occupation, the Social Security Administration found him to be disabled and granted him SSD

18

benefits.

56.     Moreover, the SSA's determination was based on *all* of Mr. Cherry's medical information, including but not limited to recent medical documentation that LIBERTY completely rejected as to his disability determination.

57.     When considering whether a claimant is disabled under sections 216(i) and 223(d) of the Social Security Act, the agency must determine whether the claimant has the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

58.     Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a)).  The steps are followed in order.  If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

59.     At step one, the agency must determine whether the claimant is engaged in substantial gainful activity (20 CFR 404.1520(b)).  If an individual engages in substantial gainful activity, he or she is not disabled regardless of how severe his or her physical or mental impairments are and regardless of his or her age, education, or work experience.  If the individual is not engaged in SGA, the

analysis proceeds to the second step.

60.   At step two, the agency must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c)).   An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.   If the claimant does not have a severe medically determinable impairment or combination of impairments, he or she is not disabled.   If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

61.   At step three, the agency must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).   If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 404.1509), the claimant is disabled.   If it does not, the analysis proceeds to the next step.

62.   Before considering step four, the agency must first determine the claimant's residual functional capacity (20 CFR 404.1520(e)).   An individual's residual functional capacity is his or her ability to do physical and mental work activities on a sustained basis despite limitations form his or her impairments.

63.     Next, the agency must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his or her past relevant work (20 CFR 404.1520(f)).  The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.  If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

64.     At the last step of the sequential evaluation process (20 CFR 404.1520(g)), the agency must determine whether the claimant is able to do any other work considering his or her residual functional capacity, age, education and work experience.  If the claimant is able to do other work, he or she is not disabled. If the claimant is not able to do other work and meets the duration requirement, he or she is disabled.

65.     Courts have determined that the Social Security Administration's disability decision should be a "significant factor" in a Court's consideration of an administrator's decision to terminate plaintiff's disability benefits. *Glenn,* 461 F.3d at 669. *See also Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 294 (6th Cir. 2005) ("the SSA determination, though certainly not binding, is far from meaningless"). Even though a favorable decision in a Social Security disability appeal does not

make a claimant automatically entitled to disability benefits under an ERISA plan: [i]f the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the administrator's decision was arbitrary or capricious. *Bennett v. Kemper Nat. Services, Inc.,* 514 F.3d 547, 554 (6th Cir. 2008). *See also DeLisle v. Sun Life Assur. Co. of Canada,* 558 F.3d 440, 446 (6th Cir. 2009).

66.    Indeed, "a decision by a plan administrator to seek and embrace an SSA determination for its own benefit, and then ignore or discount it later, casts additional doubt on the adequacy of their evaluation of . . . [a] claim[.]" *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 294-95(6th Cir. 2005).

67.    In *Darland v. Fortis Benefits Insurance Company,* 317 F.3d 516 (6th Cir. 2003), the Sixth Circuit held that a court should consider a favorable social security decision as evidence that an insurance company acted arbitrarily and capriciously by requiring a claimant to apply for social security, then ignoring the favorable social security decision. The Court explained:

> [I]t is totally inconsistent for Fortis to request that Darland apply for social security disability benefits, yet avail itself of that social security determination regarding disability to contend, at the same time, that he is not disabled. ... Though not directly applicable in this case, the principles of judicial estoppels certainly weigh against Fortis taking such inconsistent positions.

317 F.3d at 530.

68.    The Eleventh Circuit examined the juxtaposition between a Defendant insurer's self-interested SSD benefit policy requirements and its failure to give an SSA decision appropriate weight in its own disability denial determination under that same policy.  *Melech v. Life Insurance Co. of N.A.*, 739 F.3d 663 (11th Cir. 2014).  On appeal, the *Melech* Court described Defendant LIBERTY's policy in that case as follows:

> To summarize, the Policy effectively requires all claimants to apply for SSDI [Social Security Disability Income] at the outset; if a claimant fails to do so, Liberty can reduce her benefits under the Policy, if any, by the amount of SSDI Liberty says she could have gotten. In the event that Liberty decides to pay a claim, the Policy allows Liberty to hold the claim open, at least with respect to the total amount Liberty must pay, until the SSA reaches a final decision. Liberty may assist the claimant in obtaining SSDI, even going so far as to transfer the medical evidence that Liberty gathered to Liberty's vendor, who then presumably transfers it to the SSA. And if the SSA denies the claimant's application, Liberty can force the claimant to exhaust her administrative appeals. All this effort makes perfect sense from Liberty's perspective because--having decided to pay the claim-- every dollar the claimant gets from the SSA is one less dollar LIBERTY has to pay.

*Melech*, 739 F.3d at 668. Given these policy provisions and the fact that LIBERTY, at the time of its denial, did not have the evidence plaintiff presented to the SSA, the Court held "***that LIBERTY had an obligation to consider the evidence presented to the SSA.***" *Id.* at 666 (emphasis added).  The Court went on to state that "in light of these openly self-interested efforts, ***we are troubled by the***

23

*implication of LIBERTY's actions in Melech's case, where it ignored her SSDI application and the evidence generated by the SSA's investigation once it no longer had a financial stake in the outcome.*" *Id.* at 674 (emphasis added).

69.     Mr. Cherry applied for Social Security Disability benefits, as required by the policy. Moreover, Liberty was given a copy of the Social Security Notice of Decision, but in its denial letter Liberty failed to explain why it reached a conclusion contrary to that of the Social Security Administration's finding of disability. Ultimately, the SSA gave great weight to the medical opinions of Mr. Cherry's doctors. He was found unable to perform or tolerate work at any level of physical or mental exertion on a sustained, full-time basis.

70.     The Social Security determination was well supported and fully explained. Nevertheless, Liberty did not give it substantial weight and instead failed to evaluate the Social Security evidence at all. Liberty's decision to terminate Mr. Cherry's benefits was, in light of these circumstances, particularly egregious.

## COUNT ONE
## ERISA (Claim for Benefits Owed under Plan)

71.     Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

72.     At all times relevant to this action, Mr. Cherry was a participant of the LTD Policy No. GF3-850-289201-01 ("the Plan") within the meaning of 29 U.S.C.

§1002(7), and was eligible to receive disability benefits under the Plan.

73.     As more fully described above, the refusal to pay Mr. Cherry benefits under the Plan for the period from at least on or about April 2018 through the present constitutes a breach of Defendant's obligations under the Plan and ERISA. Defendant's decision to deny Mr. Cherry's benefits constitutes an abuse of discretion as its decision was not reasonable and not based on substantial evidence.

74.     Mr. Cherry brings this action to recover benefits due to him and to enforce his rights under the Plan pursuant to 29 U.S.C. §1132(a)(1)(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court to enter judgment for Plaintiff and otherwise enter an Order providing that:

1.     The applicable standard of review in this case is *de novo*.

2.     That the Court may take and review the records of Defendant and any other evidence that it deems necessary to conduct an adequate *de novo* review;

3.     Mr. Cherry met and continues to meet the Plan's definition of "Disabled";

4.     Defendant shall pay Mr. Cherry all benefits due in accordance with the Plan;

5.     Defendant shall pay to Plaintiff such prejudgment interest as allowed by law;

6.    Defendant shall pay Plaintiff's costs of litigation and any and all other reasonable costs and damages permitted by law;

7.    Defendant shall pay attorney's fees for Plaintiff's counsel;

8.    Plaintiff shall receive such further relief against Defendant as the Court deems lawful, just and proper.

Respectfully submitted this the 11th day of February, 2021.

*/s/ Peter H. Burke*_____
Peter H. Burke (ASB-1992-K74P)
pburke@burkeharvey.com
BURKE HARVEY, LLC
3535 Grandview Parkway, Suite 100
Birmingham, Alabama 35243
Phone: 205-930-9091
Fax: 205-930-9054
*Attorney for Plaintiff Cardell Cherry*

**PLEASE SERVE DEFENDANT BY CERTIFIED MAIL AT**:

Liberty Life Assurance Company of Boston
c/o Legal Department
175 Berkeley Street
Boston, MA 02116